12913

STATE v. BILTON

(153 S. E., 269)

328

Messrs. *A. J. Hydrick, Solicitor,* and *R. Lon Weeks,* for the State,

Messrs. *William C. Wolfe* and *M. S. Connor,* for respondent,

May 7, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The defendant, J. J. Bilton, upon being called to the bar in the Court of General Sessions for Dorchester County, at the March, 1929, term, to be tried for the murder of George Kizer, withdrew temporarily his former plea of not guilty and interposed two pleas in bar, one of *autrefois acquit* and the other of "former jeopardy." The state, by its Solicitor, demurred to the pleas of the defendant. The presiding Judge, Hon. William H. Grimball, sustained the demurrer as to the plea of *autrefois acquit,* but refused it as to the plea of former jeopardy, which resulted in the discharge of the defendant.

The defendant has appealed from the refusal to sustain his plea of *autrefois acquit.* The state has appealed from the

ruling in favor of the defendant as to former jeopardy. Both appeals were heard together in this Court, and will be so decided. It is unnecessary to recite in detail the four exceptions on the part of the state and the one. exception of the defendant. The questions necessary for the determination of the appeals, however, will be passed upon.

The pleas in bar were based on a former trial of the defendant in the Court of General Sessions for Dorchester county, at the October, 1928, term, before Hon. M. L. Bonham, presiding Judge, and a jury, on the identical indictment, charging the defendant with the murder of Kizer.

Certain occurrences in the trial before Judge Bonham, necessary for an understanding of the pleas in bar, were as follows: The trial was commenced on October 16, 1928. On the 17th, the jury was charged by the presiding Judge and at 12:45 p. m., retired to consider the verdict. The Court recessed until 3:00 p. m. of that day. In the afternoon, about 4 o'clock, the jury was called into the Court room and was asked if a verdict had been reached. Upon responding in the negative, but indicating that one might be reached, they were sent back for further deliberation. About 9 o'clock in the night of the same day, while the jury was still deliberating, one of the Court bailiffs informed the presiding Judge that the foreman desired to communicate with him. The jury was brought into the Court room. The foreman of the jury presented a folded sheet of paper to the Court. Judge Bonham, upon receiving this paper, read it in open Court, and the writing was as follows: *"Your Honor, the indictment has mysteriously disappeared from the table. Respectfully, Wm. Ahrens, Foreman."* It was suggested that perhaps the indictment could be found in the jury room, as there were quite a number of papers in that room, and likely the indictment had been commingled with these papers. The Solicitor stated that the misplacement of the indictment should not prevent the returning of a verdict, and that the Court could authorize the jury to return its verdict on some other paper.

The defendant and one of his counsel were present at this time, and his counsel assented to the suggestion of the Solicitor. Thereupon the Solicitor took the sheet of paper used by the foreman in his communication to the Court, and wrote thereon the usual indorsements on an indictment for murder. This paper, substituted for the indictment, was handed to the foreman, and the jury retired to their room for further deliberation.

On the following morning a part of the indictment, alleged to have been found in the courthouse yard, was presented to the Judge, and later the other part of the paper, found in the same yard, was also delivered to him. Soon after the convening of the Court, Judge Bonham had the jury brought in and ordered a mistrial. *He did not inquire if a verdict had been reached, and at the time gave no reasons for declaring a mistrial.*

The following entry. was made on the minutes of the Court by the clerk: "October 16, 1928. The State v. J. J. Bilton. Indicted for murder. His Honor, Judge M. L. Bonham, charged the jury at 12:45 p. m., and the Court adjourned until 3:00 p. m. *In this case the jury could not agree and his Honor ordered a mistrial.*" (Italics ours.)

On the 18th, after the jury had been discharged, Judge Bonham had placed on record, as he stated, "What I said and what I did this morning."

A little later the defendant moved that the Court rescind its order declaring a mistrial in the case, and that the verdict of the jury of "not guilty," alleged to have been agreed upon before the jury ·was discharged, be received and entered on the minutes of the Court. In that connection, a statement, signed by all twelve of the jurors, was presented to the Court. In brief, this paper alleged that, in all likelihood, the disappearance of the indictment from the custody of the jury was entirely accidental, as it perhaps had been dropped by one of the jurors from the window of their room, or had been blown therefrom by the wind. It was further set forth

that the deliberations of the jury had been peaceful and harmonious; that during the night, the jury had finally agreed upon a verdict of "not guilty," which had been written on the substituted paper and signed by the foreman, but the jury did not care to disturb the presiding Judge at that unseasonable hour; that early on the following morning, it was necessary for the foreman to retire to the toilet in the courthouse yard, and on this journey he was accompanied by one of the bailiffs in charge of the jury, and while in the yard a part of the indictment was found, which he brought back to the jury room with him; that, when the jury was again brought to the courtroom, discharged from further consideration of the case, and a mistrial ordered, no opportunity was given to announce the verdict, which had been agreed upon, and, if this opportunity had been permitted, a verdict of acquittal would have been rendered. The substituted paper with the words "Not Guilty," signed by the foreman, was submitted to the Court with the statement of the jury.

The motion of the defendant was overruled, and thereafter the presiding Judge made a further statement, which was taken down by the official stenographer.

The remarks of the presiding Judge, explaining the reasons for the action he took, appearing in the transcript of record, will be reported.

At the outset, let it be noted that there is quite a distinction between *autrefois acquit* and "former jeopardy." *Autrefois acquit* is a plea made by a defendant that he has been formerly tried and acquitted of the same offense. 6 C. J., 870.

"According to the decisions of this State, and the weight of authority elsewhere, it may be stated, as a general rule, that one is in jeopardy when a legal jury is sworn and impaneled to try him upon a valid indictment, in a competent Court." *State v. Rountree,* 127 S. C., 261, 121 S. E., 205; *State v. Stevenson,* 54 S. C., 237, 32 S. E., 305, 307.

"A defendant in a criminal prosecution is in legal jeopardy when he has been placed upon trial under the following conditions: (1) Upon a valid indictment or information; (2) before a Court of competent jurisdiction; (3) after he has been arraigned; (4) after he has pleaded to the indictment or information; and (5) when a competent jury have been impaneled and sworn." 16 C. J., 237.

To sustain the plea of *autrefois acquit,* a defendant must establish all the essential elements of legal jeopardy, and, in addition thereto, he is required to show that a verdict of acquittal was rendered. The effect of the sustaining by the Court of a plea of former jeopardy is equivalent in one great respect to the effect of upholding a plea of *autrefois acquit* since the result is to prevent the defendant's trial again for the offense. The main difference in the result of the sustaining of the pleas is this: In that of *autrefois acquit,* the Court declares that the innocence of the defendant of the crime charged has been legally established theretofore; while, as to former jeopardy, without a holding as to his innocence, it is declared that the State cannot try him again for the alleged crime.

It is conceded by both the State and the defendant that in the first trial, before Judge Bonham, the indictment was valid; the Court was one of competent jurisdiction for the trial of the case; the defendant was properly arraigned; he entered a plea of not guilty to the indictment; and a competent jury had been impaneled and sworn. But there was lacking to make good the plea of *autrefois acquit* proof of the defendant's acquittal. Judge Bonham very properly held that he could not accept and have entered of record the verdict attempted to be rendered after the jury had been discharged. As he well said, the members of the panel were at that time acting only as individuals and not as jurors. A verdict of a jury should be presented in open Court by the jury, properly published, assented to by all the jury, received by the Court, and ordered placed

on record before the final discharge of the jury. See *Sanders v. Charleston Consolidated, Etc., Co.,* 154 S. C., 220, 151 S. E., 438, and cases there cited. There can be no question as to the correctness of the holding of Judge Grimball when he sustained the demurrer of the State to the defendant's plea of *autrefois acquit.*

The difficulties in the case relate to the plea of former jeopardy. In considering this matter and in looking for guidance to our former decisions, we must bear in mind that there was once an important change made in the rules laid down as to former jeopardy. From the beginning of our history to the adoption of the Constitution of 1868, the principles of the common law, and our decisions construing those principles were the sole guides.

In Section 18 of Article 1 of the Constitution of 1868, the following declaration was made: "No person, after having been once acquitted by a jury, shall again, for the same offence, be put in jeopardy of his life or liberty." It was said in *State v. Shirer,* 20 S. C., 392, decided in 1883, where Mr. Justice McGowan wrote an able and interesting opinion, construing the meaning of that language: "We cannot doubt that this provision in the constitution, which deals with the subject and touches the very essence of the matter, was intended to be exclusive and exhaustive—indeed, our only law upon the subject."

It would appear, consequently, that under the Constitution of 1868 the plea of former jeopardy could not avail one at any time, except when he could show a *former acquittal* of the offense charged against him. Our decisions from the adoption of the Constitution of 1868 to the adoption of the Constitution of 1895 should therefore be read in the light of the constitutional provision then of force.

In Section 17 of Article 1 of the Constitution of 1895 amongst other things there declared, is this: "Nor shall any person be subject for the same offense to be twice put in jeopardy of life or liberty." The effect of this constitutional

enactment was a re-establishment of the principle of the common law recognized in our State up to the time of the adoption of the Constitution of 1868. *State v. Stevenson, supra.*

Since it appears that the defendant in this case called ■ to his aid the protection to individuals guaranteed in Article 5 of the amendments of the Constitution of the United States, in this language, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb," it is well to say that it is entirely settled that this provision of the Federal Constitution is not applicable to offenses and trials under the laws of South Carolina. *State v. Shirer, supra;* 16 C. J., 233.

Both the State and the defendant concede what is ■■ now fully recognized in our State, that a mistrial, ordered in a criminal case, for the inability of the jury to agree on a verdict, operates to prevent a plea of former jeopardy on the part of the defendant when called to trial again for the same offense. It seems to be admitted also, and correctly so, that a trial Judge, *under certain circumstances,* other than the failure of the jury to reach an agreement, may declare a mistrial and discharge the jury without giving the defendant the right to legally assert former jeopardy.

According to our view, the appeal of the State presents three questions for determination: (1) Was the mistrial ordered for the inability of the jury to reach a verdict? (2) If not for that reason, upon what grounds was it declared? and (3) Were the circumstances under which it was declared, legally sufficient?

It is obvious that an affirmative answer to the first question would end our investigation and result in a reversal of the holding of Judge Grimball, that the plea of former jeopardy was good. But we are compelled, because of our understanding of the law, to give a negative answer to that question.

The entry of the Clerk of the Court on the minutes that *"the jury could not agree and his Honor ordered a mistrial,"* ordinarily, would be conclusive of the whole matter, under the familiar rule that the records of the Court are to be presumed to be correct and not subject to a collateral attack. But here the distinguished jurist who presided at that trial, with his usual fairness and courage, at the same term of the Court, on the very day the clerk made the entry, attacked, or, to put it more mildly and perhaps more correctly, altered the minutes, so as to make them otherwise than what the clerk had written. And it cannot be doubted that he had the authority to do so, for the presiding Judge, certainly as long as the Court is in session, can control the minutes of the Court and the acts of the clerk in writing them.

When a mistrial is ordered in, and the jury is discharged from the further consideration of, a case, proper entry of the fact and the reasons therefor should be entered on the minutes. It is true that in some jurisdictions it seems unnecessary to show on the record the reasons for the ordering of a mistrial, the bare statement of the inability of the jury to agree being held to be sufficient; but this is the exceptional rule. The better rule, that followed in most jurisdictions, and, the one we prefer to adhere to, is that the record should show the essential facts upon which the mistrial was based, and the findings of the Court and its decision thereon. 16 C. J., 251. To aid us in the proper decision in this case, we are gratified that Judge Bonham recognized and pursued the course we think it was proper for him to follow. We have accordingly, from him, as a part of the proceedings in the Circuit Court, the reasons that moved him to declare the mistrial. *And not included in the reasons assigned was that of the jury's inability to agree on a verdict.*

It appears, indeed, for the learned Judge himself called attention to it, when the jury was last brought from the

jury room to the presence of the Court, just preceding their final discharge from consideration of the case, there was no inquiry whether or not they had agreed, and no opportunity was given for them to so announce. The custom in our Courts for many years has been, when a jury, charged with finding a verdict, comes into the Court, either voluntarily or upon the order of the Judge, that they are first asked if they have agreed on a verdict. The forms of the questions and the procedure usually followed are set forth in Miller's Compilation and Earle's South Carolina Form Book, used by our Court officials for a long time. (As a matter of historical interest, the writer takes occasion to say that he has been reliably informed that "Miller's Compilation," published in 1848, while carrying the name of the printer who published it, was really the work of Hon. David Lewis Wardlaw, one of the distinguished law Judges of his day.)

It seems generally understood to be proper, for custom, if not the written law, has made it so, that the Court, or the clerk, usually, when the jury has appeared in the Courtroom, and have taken their seats, will inquire, "Gentlemen of the jury, have you agreed upon a verdict?" Upon an affirmative answer by the foreman, the verdict is published. The clerk then asks: "That is your verdict, and so say you (old form 'ye') all?" Earle's South Carolina Form Book, 334. If there is dissent on the part of any juror, then is the time for him to speak. *Sanders v. Charleston Consolidated, Etc., Co., supra.*

"The question, 'And that is your verdict. So say ye all?' is not a mere formality. It is the acknowledgment of each of the jurors that the verdict promulgated correctly states his conviction. It may be that by the silence of the jurors they may be held to have consented to the verdict as promulgated." *Kneece v. Hall,* 138 S. C., 157, 135 S. E., 881, 882.

If "So say ye all" is not a mere formality, it occurs to us that likewise the question, "Gentlemen of the jury, have you agreed upon a verdict?" is not a mere formality. The procedure may be waived, and often is, but there is nothing in this case to show such waiver on the part of the defendant.

Although the minutes made by the clerk did not show that the usual question, "And this is your verdict, so say ye all?" was asked of the jury, the presumption ordinarily would have been that it was asked. *State v. Waring,* 109 S. C., 52, 95 S. E., 143. The usual presumption that inquiry was made whether or not the jury had agreed upon a verdict has been overcome, however, in this case, because the corrected minutes as made by the presiding Judge, show affirmatively and positively that the usual question was not asked.

For the reasons already indicated—the failure to give the jury an opportunity to announce a verdict, if one had been agreed upon, after it had appeared earlier that a verdict might be reached, the failure to ask them directly if they had reached an agreement, and, mainly, that the presiding Judge did not, in his statement correcting the minutes, give as his reason for ordering the mistrial the one of failure of the jury to agree—we must hold that the mistrial was not declared on account of the inability of the jury to agree on a verdict. In reaching this conclusion, we desire to make it clear that we have not considered at all the "after" statement of the jury that they had reached a verdict. It would be improper for this Court to consider that statement, just as Judge Bonham held he could not properly entertain it.

We have partly answered the second question as to the grounds upon which the mistrial was ordered. The statement of the presiding Judge, we think, answers it more fully. It was thought, as the foreman of the jury expressed it, that the indictment had "mysteriously disappeared." The

paper certainly had disappeared from the jury room and had gotten beyond the control of the jury, where it propely belonged. It was found in the Courthouse yard in a mutilated condition. The foreman of the jury had been separated from his fellows, and had been in the company of one of the bailiffs in the trial of the case where a deputy sheriff of the county was charged with murder. It now appears that the foreman is a most excellent gentleman, trusted by all who know him, but when the indictment disappeared, under the circumstances, it may have looked suspicious. The "atmosphere" as the Circuit Judge said, appeared to have something wrong about it. These things undoubtedly caused the Circuit Judge to order the mistrial, and, as we read his language, those were the influences that controlled him in the action he took.

We come now to the serious question, *Were the circumstances legally sufficient to warrant the order of the mistrial?* In deciding it, we look back to former decisions of our appellate Court, and regret that we find none sufficiently in point to be used as an absolute guide. But we get enlightening assistance.

Holding very close to the common law principles existing formerly in England, our constitutional Court, in 1819, made the concise declaration: "When a criminal case is put to a jury, it cannot be withdrawn, except by the consent of the accused, or by some unavoidable accident to one of the jury or the Court." *State v. Edwards,* 2 Nott & McC. (11 S. C. L.), 13, 10 Am. Dec., 557.

The tendency, a little later than that time, however, was much to broaden the rule announced in the *Edwards case.* Judge O'Neall, in *State v. McKee,* 1 Bailey (17 S. C. L.), 651, 21 Am. Dec., 499, decided in 1830, announced that a jury could be discharged, after they were charged with the trial of a case, and the prisoner could be tried a second time, for the following causes: "1st. The consent of the prisoner. 2d. Illness of one of the jury, the prisoner, or the Court.

3d. Absence of one of the jurymen. Or 4th. The impossibility of their agreeing on a verdict."

The distinguished Jurist said: "Beyond these, I apprehend the Court has no right to go."

But it appears that Judge O'Neall, some time after the decision of McKee's case, agreed to enlarge somewhat the causes he mentioned in that case.

In *State v. McLemore,* 2 Hill (20 S. C. L.), 680, decided in 1835, where Judge O'Neall also wrote the opinion, it was held that a prisoner could not sustain the plea of jeopardy where it appeared that the Court had to adjourn *sine die* because the time for its adjournment, as fixed by the statute, had arrived while the jury was considering the case and a mistral was ordered.

In 1838, Justice Butler said: "In general, when a jury is charged with a case, it cannot be discharged without rendering a verdict. This general proposition is subject, however, to many exceptions, and juries may, in many cases, be discharged without giving a verdict. Mr. Justice O'Neall has pointed out many cases, in his opinion above referred to [*State v. McKee, supra*]" *State v. Ray,* Rice (24 S. C., L.), 1, 33 Am. Dec., 90. Justice O'Neall was not present at the argument in *Ray's case,* but he concurred later in the opinion. In that case, at the first trial, after the jury was sworn, it was discovered that the indictment charged the commission of the crime on a day later than the returning of the indictment by the grand jury. The jury was discharged and a mistrial ordered. The appellate Court sustained the lower Court in its conclusion that the defendant could be tried again.

*State v. Cason,* 41 S. C., 531, 19 S. E., 918, 919, was decided under the Constitution of 1868, but it has some bearing here. The present Chief Justice presided as a Circuit Judge at the trial in the Court of General Sessions; and evidently in making a ruling, he had in his mind some of our very early decisions. After the jury had been sworn,

one of the number informed the Court that he did not think he was competent to sit on the jury because of information he had received. Upon inquiry if he could not, independent of the opinion he had already formed, render a verdict according to the evidence, the juror replied, "That is what is troubling me." The presiding Judge held that the jury had passed beyond his jurisdiction and that he could do nothing but proceed with the trial. Upon conviction and refusal of a new trial, the Supreme Court reversed the judgment. Mr. Justice McGowan, speaking for the Court, said this: "But we cannot doubt that the Circuit Judge had jurisdiction which gave him the authority to control the matter, and secure a fair and impartial jury for the trial of the defendant. The laws of the State are very tender of the character and liberty of the citizen, and guard with the greatest care the organization and composition of juries, with a view to the administration of justice, especially in criminal cases."

*The State v. Coleman,* 54 S. C., 282, 32 S. E., 406, was decided in 1899, under the provisions of the Constitution of 1895. In the first effort to try the defendant, the jury got mixed up, one or two gentlemen getting on the jury who had not been properly consented to. After the first witness had been examined, defendant's attorney called the attention of the Court that some of the jurors on the panel had not been accepted by the defendant, and others who had been accepted were not on the jury. Thereupon the Court ordered a mistrial, and proceeded anew to try the defendant. A plea of former jeopardy at the beginning of the second trial was overruled. The Supreme Court sustained the lower Court. The decision seems to have rested upon two grounds: (1) That in the first trial there had been only eleven qualified jurors, and the Constitution required a jury of twelve; (2) That the mistrial had been ordered on the defendant's motion.

The case of *Town of Cheraw v. McLeod,* 103 S. C., 417, 88 S. E., 6, 7, concerned a trial in a municipal Court, but the

principles relating to former jeopardy apply usually to all Courts having jurisdiction of criminal cases. In the trial of the defendants, because of lack of Court accommodations, the Court officials and spectators retired from the Courtroom, leaving the jury in that room to consider their verdict. After deliberation for some time, the entire jury departed, leaving in the room a slip of paper, which contained this writing, "Being unable to agree in the case of C. L. McLeod, we have adjourned." The mayor ordered a mistrial. When the case was called a second time, the plea of former jeopardy was interposed and overruled. Both the Circuit Court, to which appeal was first taken, and this Court held there had been no former jeopardy. Chief Justice Watts, then an associate Justice, concluded his opinion with this strong declaration: "It would be a travesty upon justice under such circumstances to sustain the plea of former jeopardy and acquit the prisoner."

A very recent case touching the power of a trial Judge to order a mistrial was that of *State v. Bigham*, 133 S. C., 502, 131 S. E., 603. A witness for the State died, after giving his evidence in chief, and before the defendant had the opportunity to cross-examine him. In a way, two distinct constitutional provisions were involved in the decision of the case on the point mentioned. The first was as to former jeopardy; the other, the right of one charged with crime to cross-examine witnesses against him. Section 18, Article 1, Constitution 1895. Although the defendant made no motion to strike out the evidence in chief of the deceased witness, and did not move for a mistrial, this Court held that the Judge should have ordered a mistrial

In other jurisdictions, where the Courts appear, like our own, to have leaned toward a broadening, in some respects, of the strict rules of the common law, as to the right of the trial Judge to declare a mistrial, we find by reference to *Corpus Juris,* Vol. 16, 251-253, that it has been held that the plea of former jeopardy could not be sustained when the

former jury had been discharged and a mistrial ordered on account of the following causes: The absence of the accused caused by his flight; the death, insanity, disqualification, or intoxication of a juror; illness in the family of a juror; the death or illness of the trial Judge; the illness of counsel when no associate counsel was capable of conducting the case; the fraudulent act of a person in procuring himself to be impaneled as a juror; and improper communications of a juror with outsiders.

The decisions of the Courts of other jurisdictions, and some from the appellate Courts of this State, cited in support of it, have resulted in the statement that the proper general rule in this: "The American cases hold generally that there must be a *manifest necessity* for the discharge of the jury *and leave the Courts to determine in their discretion whether under all the circumstances of each case such necessity exists.* When such necessity exists, a plea of former jeopardy will not prevail on a subsequent trial. *But if the jury are discharged without defendant's consent for a reason legally insufficient and without an absolute necessity for it,* the discharge is equivalent to an acquittal, and may be pleaded as a bar to a subsequent indictment." (Emphasis added.) 16 C. J., 250.

The principles announced in the quoted language are very much in harmony with the expressions of some of our wise jurists, delivered in recent cases, after our Courts began to break away from the rigidness of the common law doctrines. In *State v. Briggs,* 27 S. C., 85, 2 S. E., 854, 856, where the peculiar provisions of the Constitution of 1868 were under consideration, Mr. Justice McGowan, speaking of the "necessity" under which a mistrial might be declared, said the circumstances thereabout must be *extraordinary.* Chief Justice McIver, in *State v. Richardson,* 47 S. C., 166, 25 S. E., 220, 35 L. R. A., 238, considering the provisions of both the Constitution of 1868 and those of the Constitution of 1895, referred, with approval, to the former ex-

pression of Justice McGowan. Mr. Justice Jones, in *State v. Stephenson, supra,* quoted, with approval, language of the Supreme Court of the United States, that "authority to discharge a jury from giving any verdict" was limited to circumstances showing that "there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." Mr. Justice Hydrick, in speaking of the right of a trial Judge to order a mistrial, under certain circumstances, indicated that a party, discovering that a disqualified juror had been drawn or impaneled, should promptly bring the matter to the attention of the Court, and he said, "The purpose of the law is to secure a fair and impartial jury for the trial of every case." *State v. Wells,* 114 S. C., 151, 103 S. E., 515, 516.

In applying to the admitted facts of the case at bar the general rule, of which we approve, above stated, we must not overlook the rights of one charged with crime, guaranteed to him by the highest law of our State, its Constitution, adopted by the representatives of the people which all the peace officers of the State and all of its Judges have sworn to defend. We cannot resist the impulse to follow that honored soldier, statesman, and jurist, Justice McGowan, in his approval of some of the things said by the great writer on criminal law, Mr. Bishop, quoted in *State v. Briggs, supra:* "The law casts its protection over all persons alike. Hence, before any person can be made to suffer for a crime, he must be caught and held in the exact meshes which the law has provided; or, in other words, he must be proceeded against step by step according to the rules of practice which the law has ordained. It is no avail to proceed against him according to other and better rules. The law's rules must be pursued, or the law's penalty cannot be imposed upon him for his crime.   *   *   *   Human laws are meant to secure the outward order of society; and a part of this order, not less essential than any other part, consists in pursuing the

exact methods which the law has laid down in bringing criminals to justice."

Following the expressed desire of the present head of this Court, to prevent a "travesty upon justice" *(Cheraw v. Mc-Leod, supra),* but recalling that "The law casts its protection over all persons alike," as said by Mr. Bishop, we endeavor to apply the rule of "manifest necessity" to the admitted facts of this case, and inquire if the discharge of the jury by Judge Bonham, without the defendant's consent, was "for a reason legally sufficient."

True, the indictment got out of the actual possession of the petit jury, but it was not shown that this did not happen accidentally. Even accidents occur "mysteriously." The Solicitor, after his investigation, stated, in open Court, that he was satisfied the disappearance of the paper was not purposely brought about and certainly that it was not occasioned dishonestly by any member of the jury. The mutilation of the indictment was not caused, so far as the facts showed, by any of the jurors, or by any person connected with the trial, or by anyone interested therein. It is not improbable that some person, innocently, or perhaps some one not directly interested in the result of the case, mischievously mutilated it. The loss of the indictment, or its mutilation, could not of itself legally interfere with the jury rendering a correct verdict. It was clearly within the power of the Court to do what was done in this instance, substitute another indictment, or some paper on which the verdict could be rendered, for the Court has always the power to substitute lost, missing, or destroyed papers.

In any event, and we are influenced very much by this, it nowhere appears that the defendant, or any one acting in his behalf, was connected in any way with the withdrawal of the indictment from the custody of the jury and its mutilation. Certainly, if some one sought to put the defendant at a disadvantage by disposing of the indictment, the de-

fendant should not be held responsible for that act. If it be conceded that the indictment disappeared with the wrongful intent of some one, so far as the record before us discloses, the act may have been as easily attributable to some one opposed to the defendant's acquittal as to another who was seeking to benefit the defendant.

Neither do the circumstances surrounding the disappearance and mutilation of the indictment appear to us sufficient to show that the members of the jury were not fair and impartial; and, as Mr. Justice Hydrick said, in effect, in *State v. Wells, supra,* in the trial of jury cases, it is the purpose of the law to secure, a fair and impartial trial.

There may have been "something wrong about the atmosphere of the trial" sufficient to arouse the suspicions of the learned Circuit Judge. And we can readily see how a discerning Judge, intensely interested in the proper administration of justice, may have thought it necessary, because of the conditions, to order a mistrial. We think it would be a dangerous precedent, however, to approve the direction of a mistrial and force the defendant to another trial simply because of "atmospheric conditions," without a proper showing in open Court of some *manifest necessity* therefor. And the better practice, it seems to us, would be, when it occurs to the trial Judge that a mistrial perhaps should be ordered for any cause, before declaring the same, to examine into that cause in open Court, make his findings thereon, and place on the record his decision and the reasons therefor.

At all times, a defendant in a criminal case is entitled to the benefit of the reasonable doubt. The circumstances here, with that principle of law in mind, compel us to conclude that there was not a *manifest necessity* for the mistrial directed. It follows that Judge Grimball correctly sustained the plea of former jeopardy.

The judgment of this Court is, as to both appeals, that the order of the Circuit Judge be affirmed.

Mr. Chief Justice Watts and Messrs. Justices Cothran, Stabler and Carter concur.